# NEWMAN *v.* UNITED STATES EX REL. PRENDER.

---

STATUTES; REPEAL; PAWNBROKERS; CONSTITUTIONAL LAW.

1. The act of Congress of February 4, 1913, regulating the business of loaning money on security of any kind by persons and companies other than banks, etc., repealed by implication the act of March 2, 1889, and its amendment, defining pawnbrokers and regulating the pawnbroking business. (Citing *Fulton* v. *District of Columbia*, 2 App. D. C. 431, 438.)

2. The classification and discrimination involved in the act of Congress of February 4, 1913 (— Stat. at L. —), which permits resident individuals and foreign corporations to be licensed as pawnbrokers in the District of Columbia, but excludes nonresident individuals, is not so unreasonable and arbitrary as to render the act uncon-

stitutional. (Distinguishing *Curry* v. *District of Columbia,* 14 App. D. C. 423, 428.)

No. 2580. Submitted October 9, 1913. Decided November 3, 1913.

HEARING on an appeal by the respondents, the commissioners of the District of Columbia, from a judgment of the Supreme Court of the District of Columbia awarding a writ of mandamus compelling them to issue a pawnbrokers' license to the relator.                                           *Reversed.*

The COURT in the opinion stated the facts as follows:

The commissioners of the District of Columbia appeal from a judgment of the supreme court of the District directing a writ of mandamus to issue to them.

Pending the appeal Commissioners Rudolph and Johnston have retired from office, and their successors, Oliver P. Newman and Frederick L. Siddons, have been substituted as parties appellant, and the title of the cause changed.

The petition of the relator alleges that he is a citizen of the United States residing in the county of Alexandria, State of Virginia. That he applied to the said commissioners on March 14, 1913, for a license as pawnbroker, in compliance with the acts of Congress of March 2, 1889, and March 3, 1891, to regulate and license pawnbrokers in the District of Columbia. That he possessed the qualifications required by said statutes, and tendered the license fee required thereby. That the commissioners refused to issue said license, upon the sole ground that said laws had been repealed by the act approved February 4, 1913. He prays that the said commissioners be commanded to issue said license demanded by him as aforesaid.

The return to the rule to show cause the commissioners answered as follows: "Defendants admit the allegations of fact contained in the said petition for the purposes of the said rule, but deny the conclusions of law set forth therein, and say that pawnbrokers in the District of Columbia can only be licensed under the act of February 4, 1913, to carry on the business of

loaning money at 3 per cent a month, and that the said act has to that extent repealed the act of March 2, 1889, relating to pawnbrokers."

The court sustained relator's demurrer to said answer; held the act of February 4, 1913, to be void as to relator, and not a repeal of the previous statutes; and directed the writ of mandamus to issue as prayed.

*Mr. E. H. Thomas,* Corporation Counsel, and *Mr. F. H. Stephens,* Assistant, for the appellants:

1. The discriminating clause is not so tied up with the remainder of the act that all of its provisions must stand or fall together. The discriminating clause may be entirely omitted, and leave the rest as a homogeneous and valid piece of legislation. *Armes* v. *District of Columbia,* 8 App. D. C. 393, 416; *District of Columbia* v. *Green,* 29 App. D. C. 296; *Hyde* v. *Southern R. R. Co.* 31 App. D. C. 466, 470; *Penniman's Case,* 103 U. S. 714, 717; *Diamond Glue Company* v. *United States,* 187 U. S. 611; *R. R.* v. *Schutte,* 103 U. S. 118; *U. S.* v. *Reese,* 92 U. S. 214, 221; *Field* v. *Clark,* 143 U. S. 649; *Huntington* v. *Worthen,* 120 U. S. 97–102; *McPherson* v. *Blacker,* 146 U. S. 1, 41; *Ward* v. *Maryland,* 12 Wall. 418, 430; *Employers' Liability Cases,* 207 U. S. 463, 500, 501; *Guy* v. *Baltimore,* 100 U. S. 434, 443, 444; *Regan* v. *Farmers' Loan & T. Co.* 154 U. S. 362; *Supervisors* v. *Stanley,* 105 U. S. 305, 315; *Leisy* v. *Harding,* 135 U. S. 100; *Ross* v. *Cemetery,* 8 App. D. C. 32, 40; *Hampton* v. *St. Louis, I. M. Etc. R. Co.* 227 U. S. 456; *Southern P. Co.* v. *Portland,* 227 U. S. 559; *Butts* v. *Merchants' Etc. Co.* No. 17 Advance Sheets, p. 964; *So. Pac. Co.* v. *Campbell,* No. 17 Advance Sheets, p. 1027; 36 Cyc. 982; *Fawall* v. *State,* 69 Ala. 10–13; *Story* v. *Descamp,* 53 Ark. 490–493; *State* v. *Marsh,* 37 Ark. 356, 360, 361; *Com.* v. *Petrinseh,* 183 Mass. 217, 220; *State* v. *Scampini,* 77 Vt. 92, 121; *State* v. *Gerhardt,* 145 Ind. 439; *People* v. *Richmond,* 59 Mich. 570; *State* v. *Paul,* 5 R. I. 185.

2. Pawnbrokers are a class for many years well recognized as

subject to the police power of a State. Freund, Pol. Power, secs. 43, 93.

3. In occupations subject to the police power, discriminations may be made against nonresidents. Freund, sec. 710; *Bartemeyer* v. *Iowa,* 18 Wall. 129, 133; *Tragesser* v. *Gray,* 9 L.R.A. 780.

4. A nonresident corporation is not a citizen within the meaning of the privilege and immunity clause of the Constitution. *Blake* v. *McClung,* 172 U. S. 239, and 176 U. S. 59, reaffirmed; *Paul* v. *Virginia,* 8 Wall. 168.

5. A state may exclude nonresident corporations. *Ins. Co.* v. *Mass.* 10 Wall. 566, 573; *Ins. Co.* v. *Morris,* 20 Wall. 445, 458; *Pensacola Tel. Co.* v. *Western U.* 96 U. S. 1, 24; *Reefe* v. *Rundle,* 103 U. S. 222, 225; *R. R.* v. *Koontz,* 104 U. S. 5, 11; 6 U. S. Enc. 308, note 9.

*Mr. Charles Cowles Tucker* and *Mr. Edward S. Bailey,* for the appellee (*Mr. J. Miller Kenyon* and *Mr. Henry B. F. Macfarland* being with them on the brief):

1. The act approved February 4, 1913, does not repeal the pawnbrokers' act of March 2, 1889, as amended by the act of March 3, 1891, nor does it apply to pawnbrokers. The act of February 4, 1913, makes no mention of pawnbrokers, nor does it give a definition of the class of lenders known as pawnbrokers. The later act permits the lender licensed under it to loan money on securities of any kind, while the act of March 2, 1889, defines a pawnbroker as a person who lends money on deposits or pledges of personal property or other valuable thing other than securities or printed evidences of indebtedness. If the act of February 4, 1913, is a repeal of the act of March 2, 1889, then we have in the District of Columbia no such class of lenders designated as pawnbrokers, because the act of February 4, 1913, makes no distinction between lenders on personal property and securities or printed evidence of indebtedness, while the act of March 2, 1889, defines a pawnbroker as one who lends money on things. The act of February 4, 1913, does not regu-

late the sale of the thing pawned or pledged, or provide how long the pawn or pledge shall remain in the possession of the pawnbroker before it shall be sold, nor does it, as is provided by the act of March 2, 1889, provide what shall become of the surplus arising from the sale of the articles pawned. Clearly such sections of the act of 1889 have no substitute provided by the act of February 4, 1913, and which are really essential to the proper administration of a pawnbrokers' act, in respect to the regulation of the sale of the thing pawned, the term for which it shall remain in pawn, or what shall become of the surplus arising from the sale of the articles pawned after payment of the indebtedness. The act of February 4, 1913, does not operate to prohibit the doing of business by any person who takes a pledge or pawn if the rate of interest is 6 per cent or under, while the old pawnbrokers' act embraced a class of lenders, and had a reason for so doing, who loaned money on a pawn or pledge of personal property at any rate of interest. So, if it be held that the act of February 4, 1913, repeals the act of March 2, 1889, the anomalous situation would be presented of having a class of lenders known as pawnbrokers who are permitted to loan money on a pawn or pledge of personal property, and who do not by the express terms of the act of February 4, 1913, come within the provisions thereof; and, accordingly, there would be no law which in anywise could control or regulate a pawnbroker who loans money on pawn or pledge for 6 per cent or less. Again, a licensee under the new act could, if it repeals the pawnbrokers' act, in conducting the business of pawnbroking, issue tickets for one week at the rate of 1 per cent a month, and provide in them that on default the pledge could be sold at private sale, with the right to purchase it himself. In this way necessitous borrowers would be wholly at the mercy of the pawnbrokers.

The act of March 2, 1889, is comprehensive and complete, and it is not reasonable to assume that Congress intended to repeal that act by implication by the act of February 4, 1913, which is not a substitute for the former act, nor complete and definite in its provisions with respect to pawnbrokers. 26 Am.

& Eng. Enc. Law, 723, 725, 726; *D. C.* v. *Sisters of Visitation,* 15 App. D. C. 308; *United States* v. *Claflin,* 97 U. S. 546.

2. The act of February 4, 1913, is unconstitutional and void on the ground that it is discriminatory. It discriminates in favor of the resident and against the nonresident citizen. It does more; it provides a class of nonresidents into which it puts nonresident corporations and nonresident individuals, and from this class it selects the nonresident corporation and confers upon it the privilege of doing business under the provisions of the act, and at the same time, in express terms, denies to a nonresident individual the privilege it has granted to the nonresident corporation, thereby unjustly discriminating in favor of the one and against the other. Such discrimination is clearly repugnant to article 4, sec. 2, and also to the 14th Amendment to the Constitution of the United States, and is a denial to the appellee of the equal protection of the laws. *Ward* v. *Maryland,* 12 Wall. 418; *Braceville* v. *Doherty,* 30 Ill. App. 645; *State* v. *Furbush,* 72 Me. 493; *McGuire* v. *Parker,* 38 La. Ann. 832; *Fecheimer* v. *Louisville,* 84 Ky. 306; *Brooks* v. *Mangal,* 86 Mich. 576; *State* v. *Cadogan,* 73 Vt. 245; *Connolly* v. *Union Sewer Pipe Corp.* 184 U. S. 540; *Pasadena* v. *Stimson,* 91 Cal. 238; *Sayre* v. *Phillips,* — Pa. —, 16 L.R.A. 49; *Walling* v. *Michigan,* 116 U. S. 466; *Curry* v. *District of Columbia,* 14 App. D. C. 423; *Lappin* v. *District of Columbia,* 22 App. D. C. 68; *McGuire* v. *District of Columbia,* 24 App. D. C. 22; *Yick Wo* v. *Hopkins,* 108 U. S. 356; *Barbier* v. *Connolly,* 113 U. S. 27.

It is not contended that Congress has not the right to classify occupations and to impose different taxes upon different occupations, provided there is no arbitrary classification and no discrimination between persons engaged in the same occupation. The conclusion to be deduced, however, from the authorities, is that the Constitution is only satisfied if all persons similarly situated are treated alike as to the privileges conferred or the liabilities imposed.

The act of February 4, 1913, without any plausible reason for it, and serving no good or public purpose, arbitrarily makes

the distinction between individuals who are not residents and nonresident corporations.

The argument is made by the appellants, and cases are cited in support of the proposition, that pawnbrokers are subject to the police power of a State. It is apparent that appellants misconceive the character, scope, and application of the act of February 4, 1913. The act does not mention pawnbrokers or purport to apply to them, nor in anywise include persons who come within the definition of pawnbrokers as they are defined by the act of March 2, 1889, but only has to do with the general business of lending money on security of any kind, etc.,—a business as much a part of domestic trade and commerce as any other legitimate business, and which cannot be the subject of discrimination any more than other businesses in which persons may engage. The business of loaning money is as much a part of domestic trade and commerce as any other legitimate business. *Re Sohncke,* 2 L.R.A.(N.S.) 813.

Assuming, however, that appellants are correct in their contention that the general business of loaning money is subject to the police power, yet their position is still untenable, for, if the act disregard the principle of equality of right and allow the business to be carried on by one person and prohibit others from engaging in it, the act is discriminatory and void. Under the police power, a State may require licenses and charge for the granting of the same.   *   *   *   There must, however, be no discrimination between residents and nonresidents. 8 Cyc. 1046. It is not competent for them (the commissioners) to disregard the principle of equality of right, and allow the business to be carried on by one person, and to prohibit all others from engaging in it. *Curry* v. *District of Columbia,* 14 App. D. C. 423.

Broadly speaking, practically every occupation is subject to the police power, and consequently to regulation by the legislature. Thus, butchers, bakers, grocers, and, indeed, all dealers in foodstuffs, are within the regulatory powers of the legislature; but this does not mean that the legislature may prohibit such occupations. Regulation is one thing; prohibition is an-

other.    If Congress may prohibit a resident of Maryland or
Virginia from coming into the District of Columbia and avail-
ing himself of the privilege which Congress by the act of Feb-
ruary 4, 1913, has attempted to accord to residents of the Dis-
trict of Columbia and to nonresident corporations, of lending
money at the rate of 1 per cent a month, it may prohibit resi-
dents of those and other States from crossing the boundary
lines of the District and doing business here as butchers, bakers,
and grocers, while permitting residents and nonresident cor-
porations to engage in such occupations.    In view of the small
area of the District of Columbia, and the fact that thousands
of people doing business within its boundaries have their legal
residence in suburban settlements beyond its boundaries, in
the States of Maryland and Virginia, the question presented is
one of gravity and far-reaching importance.    Chevy Chase is
4 miles from the business center of the city of Washington, but
is in the State of Maryland.    Practically all of the residents of
that place, who claim Maryland as their legal residence, are
engaged in business in Washington.    Cherrydale, Virginia, the
home of the appellee, is only a mile or two beyond the District
line.    Has Congress the power to declare that, as a condition of
continuing to do business here, the residents of Chevy Chase
and the appellee must surrender their State residence and be-
come residents of the District, or incorporate their business?
It is this power which Congress has attempted to exercise by
the act in question, and which the appellee denies it possesses.

3. The discrimination to be found in the 1st section of the
act of February 4, 1913, renders void the whole act.

Nonresident individuals are, by the express terms of the act
of February 4, 1913, prohibited from doing business under the
act.    If the discriminatory feature of the act is separable, as is
contended by the appellants, then, notwithstanding the plain
prohibition of the statute, the court will be in a position of ex-
tending the benefits of the act to nonresident individuals by
permitting them to take out licenses under it, although Con-
gress intended that they should not receive such benefits.

Appellee contends that if the elimination of an invalid clause

of a statute serves to extend the scope of the statute contrary to the express intention of the legislature, then such invalid clause is not separable, and the whole statute is void. *Connolly* v. *Union Sewer Pipe Co.* 184 U. S. 540; *Com.* v. *Hana,* 11 L.R.A. (N.S.) 799; *Poindexter* v. *Greenhow,* 114 U. S. 270; *Spraigue* v. *Thompson,* 118 U. S. 90; *Rogers* v. *Kent Circuit Judge,* 115 Mich. 441; *Matthews* v. *People,* 202 Ill. 389, 63 L.R.A. 73.

4. The act of February 4, 1913, is unconstitutional and void in that it denies the equal protection of the laws to persons engaged in the same character of business.

The act provides that if any person loans money at a rate of interest in excess of 6 per cent per annum on any security of any kind, direct or collateral, tangible or intangible, without procuring a license, he shall be subject to a criminal prosecution, forfeiture of all interest, together with the forfeiture of one fourth of the principal. If the lender does not lend money on security, he does not come within the provisions of the act. It is submitted that the act is unconstitutional and void in that it does not apply equally to lenders of the same general class, but favors those who lend without security, and discriminates against those who lend on security.

The penalty provided in the act of February 4, 1913, seems to be leveled at the act of requiring security of any character, direct or collateral, tangible or intangible, for the money loaned, and not at the act of contracting for or receiving a usurious rate of interest. Accordingly, the act makes it a criminal offense to secure in any way the debt tainted with usury, but does not make it a criminal or other offense to contract the debt without security tainted with usury. It does not attempt to control, regulate, or in anywise affect those who loan money without exacting security therefor. The capriciousness and unreasonableness of this provision of the act is very apparent. It should be borne in mind that the taking of security for the debt tainted with usury constitutes the offense. Is there anything inherently wrong or unnatural in accepting a promissory note as security for a debt, a recognized essential in the vast majority of business transactions where credit is extended? Is it conceivable

that any good purpose could be served by making it a criminal offense to take a promissory note as security for a certain debt, when the act of usury alone is not made an offense by the provisions of the act? The classification thus attempted to be made is arbitrary and capricious, and not natural and reasonable, and, accordingly, it is clearly manifest that equal protection of the laws is denied by this attempted legislation. The precise question here raised was decided adversely to such a classification in Re Sohncke, 2 L.R.A.(N.S.) 813.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. The act approved February 4, 1913, is entitled: "An Act to Regulate the Business of Loaning Money on Security of Any Kind by Persons, Firms, and Corporations Other Than National Banks, Licensed Bankers, Trust Companies, Savings Banks, Building and Loan Associations, and Real Estate Brokers in the District of Columbia."

The 1st section makes it unlawful to engage in the business of lending money "upon which a rate of interest greater than 6 per centum per annum is charged on any security of any kind, direct or collateral, tangible or intangible, without procuring license." Said license tax is fixed at $500 per annum. "No license shall be granted to any person, firm, or voluntary association unless such person and the members of any such firm or voluntary association shall be bona fide residents of the District of Columbia,    *    *    *    and no license shall be granted to any joint stock company, incorporated society, or corporation unless and until such company, society, or corporation shall, in writing and in due form, to be first approved by and filed with the commissioners of the District of Columbia, appoint an agent, resident in the District of Columbia, upon whom all judicial and other process or legal notice directed to such company, society, or corporation may be served."

Section 2 provides that all applications for licenses must be made in writing to the commissioners, and sets out the require-

ments of said applications. Section 3 requires a bond for $5,000, conditioned that the obligor will not violate any law relating to such business. Persons recovering judgment against licensees may, if the same be not satisfied, have a copy of said bond delivered to them, and may sue thereon in their own names. Said bond shall be renewed and refiled annually.

Section 4 requires licensees to keep a registry of all loans, showing dates of loans, amounts, rate of interest, where property is situated, etc.; and to make an annual statement to the commissioners in the form of a trial balance of their books, showing liabilities and assets, and giving such other information as may be called for.

Section 5 provides that no such loan shall exceed $200, and that no greater interest than 1 per cent per month shall be charged, and provides for forfeiture of one fourth of the principal of the loan when a greater rate of interest than that fixed is exacted.

Section 6 provides that complaints against a licensee shall be made in writing to the commissioners, who shall have hearings of the same, of which notice shall be given to the party complained of, whose license, after notice and opportunity to be heard, may be revoked for good cause shown.

Other sections provide penalties for violations of the act, and other things relating to charges and fees.

Section 12 repeals all acts and parts of acts inconsistent herewith.

The foregoing is not a complete synopsis of this lengthy act. It merely presents an outline of its general object, with an abstract or recital of such portions of the act only as are directly involved in the determination of this particular case.

2. There had been much public complaint attending the lending of money in the District of Columbia, in comparatively small sums, upon pledge or other security, by persons engaged in the business, whether technically pawnbrokers within the meaning of former licensing acts or not.

The act undertook to remedy these mischiefs, in part at least, through license and regulation.

In return for the somewhat high license tax and the regulations imposed, this class of lenders is given the right to exact a greater rate of interest than is permitted to bankers and others who are excluded from its operation; and it does not include any who lend at a rate not greater than 6 per cent per annum.

In general terms a pawnbroker may be said to be one who lends money, usually in small sums, upon property delivered in pledge. While it is true that the definition is more precise in the act of 1889 than in this, we are of the opinion that the business is within its scope. It is to be borne in mind that the act of 1889 was intended to apply to pawnbrokers exclusively, and its definition was necessarily precise, so as not to include others lending money in small sums upon security generally; whereas the description of the present act was broadened so as to include all.

Relating, therefore, to the same subject-matter, and intended as a substitute for it and the subsequent amendatory acts, the latter, if valid, had the effect to repeal the former. *Fulton* v. *District of Columbia,* 2 App. D. C. 431, 438, and cases there cited.

3. It is agreed that the judgment below rested upon the ground that the act of 1913 is unconstitutional and void, because of the discrimination made in the 1st section between residents of the District and nonresidents, and between residents of other States and incorporated associations of other States.

That there is such discrimination cannot be denied; and the question is, considering the nature of the business regulated, whether the classification and discrimination are within the power of Congress. Congress, in legislating for the District of Columbia, is vested with the ordinary police power of the States within their several limits, and is not limited by the provisions of the 14th Amendment. However, as has been said in a former case, "The power is exclusive, but it is not unlimited, nor is it arbitrary." *Curry* v. *District of Columbia,* 14 App. D. C. 423, 438. In that case, which is relied on here by the appellee, it was held there could be no discrimination between certain persons in the District, pursuing a business neither injurious

nor objectionable, and at all times open to be freely pursued by those desirous to engage in it, whereby certain ones of the same class were given a substantial, practical advantage over others. The regulation of the rates of interest is a matter clearly within the police power. *Griffith* v. *Connecticut,* 218 U. S. 563, 569, 54 L. ed. 1151, 1153, 31 Sup. Ct. Rep. 132. The business of lending money in small sums upon pledge or security is one within the police power and subject not only to license, but also to regulation for the prevention of mischiefs attending it. *State* v. *Hurlburt,* 82 Conn. 232, 72 Atl. 1079; *Griffith* v. *Connecticut,* 218 U. S. 563, 570, 571, 54 L. ed. 1151, 1154, 31 Sup. Ct. Rep. 132.

As said in the case last cited (p. 569): "The power to regulate existing, the details of the legislation and the exceptions proper to be made rest primarily within the discretion of the State legislature, and 'unless such regulations are so unreasonable and extravagant as to interfere with property and personal rights of citizens, unnecessarily and arbitrarily, they are within the power of the State; and the classification of the subjects of such legislation, so long as such classification has a reasonable basis, and is not merely arbitrary selection without real difference between the subjects included and those omitted from the law, does not deny to the citizen the equal protection of the laws.' *Watson* v. *Maryland,* 218 U. S. 173, 54 L. ed. 987, 30 Sup. Ct. Rep. 644."

In *Watson* v. *Maryland* the principal objection urged to an act regulating the practice of medicine and licensing physicians was the exception of resident physicians or assistant physicians at hospitals and students on hospital and dispensary duties. The court said (p. 180): "The selection of the exempted classes was within the legislative power, subject only to the restriction that it be not arbitrary or oppressive, and apply equally to all persons similarly situated. We cannot say that these exceptions nullify the law."

It is the settled doctrine of the Supreme Court of the United States in cases arising under the 14th Amendment, which in some respects is more **restrictive** of State legislation than is

the 5th Amendment restrictive of Federal legislation, that the legislature is the judge of the means necessary to an end within its power, and unless its regulations are palpably arbitrary and oppressive, it is not for the courts to say that they are beyond the exercise of the legitimate power of legislation.

"The legislature, being familiar with local conditions, is, primarily, the judge of the necessity of such enactments. The mere fact that a court may differ with the legislature in its views of public policy, or that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference, unless the act in question is unmistakably and palpably in excess of legislative power." *McLean* v. *Arkansas,* 211 U. S. 539, 547, 53 L. ed. 315, 319, 29 Sup. Ct. Rep. 206; see also *Barrett* v. *Indiana,* 229 U. S. 26, 29, 57 L. ed. 1050, 1052, 33 Sup. Ct. Rep. 692; *Murphy* v. *California,* 225 U. S. 623, 630, 56 L. ed. 1229, 1232, 41 L.R.A.(N.S.) 153, 32 Sup. Ct. Rep. 697; *Quong Wing* v. *Kirkendall,* 223 U. S. 59, 62, 56 L. ed. 350, 351, 32 Sup. Ct. Rep. 192.

This power of classification of persons, making different provision in relation to residents and nonresidents, has frequently been upheld as being reasonable. *Travellers' Ins. Co.* v. *Connecticut,* 185 U. S. 364, 46 L. ed. 949, 22 Sup. Ct. Rep. 673; *Field* v. *Barber Asphalt Paving Co.* 194 U. S. 618, 48 L. ed. 1142, 24 Sup. Ct. Rep. 784; *District of Columbia* v. *Brooke,* 214 U. S. 138, 150, 53 L. ed. 941, 945, 29 Sup. Ct. Rep. 560; *Watson* v. *Maryland,* 218 U. S. 173, 179, 54 L. ed. 987, 990, 30 Sup. Ct. Rep. 644.

In determining whether the classification is reasonable or arbitrary, "not only the final purpose of the law must be considered, but the means of its administration,—the ways it may be defeated." *St. John* v. *New York,* 201 U. S. 633, 637, 50 L. ed. 896, 898, 26 Sup. Ct. Rep. 554, 5 Ann. Cas. 909.

The purpose of the act under consideration was to cure mischiefs resulting from money lending of the kind defined, through former inefficient, or want of, regulation. The new regulations requiring bonds suable by injured persons, notices

to licensees of complaints, investigations, etc., upon which the successful administration of the new law, in a measure, depended, and through want of which it might be defeated, was the apparent reason why licensees, in the case of natural persons and unincorporated associations, were limited to residents. These were within the jurisdiction, and could be personally served with process, and the notices required. Such persons living out of the District could not be so served. The reason for this discrimination is emphasized by the admission of corporations of other States, which is also claimed to be an arbitrary discrimination. Such corporations could be required, as a condition of permission to do business in the District, to designate some resident upon whom personal service of process and notice could be had.

Such corporations were therefore in the condition of resident persons for all the purposes of the act. We are not prepared to say that these are not reasonable grounds for the classification; much less that they are palpably unreasonable and arbitrary.

The judgment is reversed with costs, and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

On application of the appellant a writ of error to the Supreme Court of the United States was allowed by this cour⁺ on November 7, 1913, and the following PER CURIAM opinion delivered:

In view of the action of the Chief Justice of the Supreme Court of the United States in granting a writ of error in the case of *United States Surety Co.* v. *American Fruit Product Co.* 40 App. D. C. 239, the writ is allowed as prayed, and the bond for costs on said writ is fixed at the sum of $300.